WATERMAN LUMBER & SUPPLY CO. v. KING. (No. 1423½.)†

(Court of Civil Appeals of Texas. Texarkana. May 27, 1915. Rehearing Denied June 17, 1915.)

1. MASTER AND SERVANT  190—LIABILITY FOR INJURIES — NEGLIGENCE OF FELLOW SERVANT.

Plaintiff and C. were loading lumber on a truck of lumber. C. was lowering each piece to plaintiff, who placed it on the truck. Plaintiff called to C. to wait while he straightened a plank on the truck, but C., who was then lowering a plank, lowered it the usual distance downward, and then turned it loose, resulting in the plank striking plaintiff. C. had no authority to hire and discharge employés, but plaintiff testified that C. would make a report to the foreman whether a man would work or not and would go to the foreman if a man did not want to work after he was told by him what to do. *Held* that, even though C. had power or functions of a vice principal, he was not exercising them at the time of the injury, but was discharging the duties of a fellow servant, and, for his negligence, the employer was not liable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 449–474; Dec. Dig.  190.]

2. MASTER AND SERVANT  139—LIABILITY FOR INJURIES—NEGLIGENT ORDER OF FOREMAN.

Where it did not appear that the plank slipped or was caused to fall because C. was hurrying, the foreman's direction to C. and plaintiff to hurry with the work did not render the employer liable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 275, 282, 289, 296; Dec. Dig.  139.]

Appeal from District Court, Shelby County; W. C. Buford, Judge.

Action by E. A. King against the Waterman Lumber & Supply Company. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

The action is for damages by appellee, an employé of appellant, a sawmill corporation, who received personal injuries in his work of loading lumber from piles or stacks onto a truck or vehicle used for the purpose, through the negligent act, as alleged, of M. D. Cheek, assisting and jointly working with appellee, in shoving or pushing a plank onto plaintiff. The petition alleged that M. D. Cheek was the authorized foreman of appel-

lant, and over appellee, with authority of direction and control of the kind of work required and the manner in which it should be done, and it was the duty of plaintiff so to do the work, as he was doing, as directed by M. D. Cheek. The appellant, besides traversing the allegations, pleaded as a defense that M. D. Cheek was not a vice principal or a foreman, but was only a mere fellow servant of the plaintiff, and for whose negligence, solely causing the injury, the appellant was not legally liable. By supplemental petition the appellee, among other things, alleged that, while appellee and M. D. Cheek were doing the work of loading out the lumber as expeditiously as could be done with safety, one W. C. Pittman, shed foreman and in general charge of all the work, came up and severely reprimanded M. D. Cheek for the time he was taking to load the lumber, and ordered and required of M. D. Cheek and appellee to hasten the work; and that, in an effort to obey the order of his superior, the said M. D. Cheek pushed the planks down on appellee. And it is averred that the order of W. C. Pittman, appellant's vice principal, to do the work faster, rendered the doing of the work unsafe and was an act of negligence proximately causing the injury, for which appellant was responsible. The case was tried to a jury, and verdict for appellee.

The evidence establishes that the lumber, when sawed, was placed in piles or stacks, according to dimensions of the plank, of about 16 feet high, for the purposes of assortment and as a drying out process. In order to load out the lumber for final shipment in railway cars, it was taken from the stacks and put on a truck or vehicle provided for the purpose, and then hauled to the railway car for loading therein. The men loading the mill truck or vehicle did not have anything to do with carrying it to the railway cars or loading of the lumber in the railway cars. In loading the lumber from the stacks onto the mill truck or vehicle, the men employed so to do, as were appellee and Cheek, work two together, and no more, at the time on each stack. M. D. Cheek and appellee worked together as a gang or crew. The work is done by one man getting on the top of the stack of lumber and the other remaining on the ground or floor, and the man on the top of the stack picks up one end of a plank and pushes it endwise downward to the reach of the man on the ground or floor, who then takes it and places it in regular tiers on the truck or vehicle. At the time of his injury on July 20, 1913, appellee and M. D. Cheek were engaged in their work of loading lumber on a truck or vehicle from a stack of lumber, about 16 feet high and between 10 and 12 feet wide, containing plank of the dimensions of 1x6, 16 feet long. The truck was located 4 or 6 feet distant from the particular stack of lumber. M. D. Cheek was on top of the stack, lowering the plank

one at a time, and appellee was at the bottom receiving same and laying them on the truck in tiers as they were passed down to him by Cheek. About 15 or 20 minutes before he was hurt, W. C. Pittman, the shed foreman, came to where appellee and Cheek were working and directed them to change the work from the stack of lumber they were then on to the instant stack in controversy, and they did so. The injury occurred, as described by appellee, in the manner and way following:

"Mr. Cheek said to me when we got to this stack of lumber (it was a high stack): 'I will get up and shove it down. You are taller and can reach the lumber.' We had a buggy in the run between two stacks of lumber, and it was standing here (indicating), and we had loaded on several pieces. I think maybe we had loaded on 25 pieces. It is a rule in loading lumber on to get it in tiers and as near even as possible. One of the pieces of plank got crossways, and I raised my hand to Cheek and said, 'Wait till I straighten this plank.' He was coming over with this lumber, and I was on the opposite side. The cart wheel was up like this, and here were the planks (indicating), and when this plank was shoved off he turned it loose, and it came down and struck the other end of the lumber and glanced off, and I got back as quick as I could, and back to the ends of the lumber, and couldn't back any farther, as I was jammed in, and this plank came endwise and struck my testicles."

On cross-examination appellee testified:

"The runs between the stacks of lumber are from 14 to 16 feet wide. In this run was just the buggy and myself. The buggy was about 4 or 6 feet from the end of the lumber, so this lumber could come down on it. This left the buggy about 10 feet from the end of the stack of lumber opposite. I was standing right up there getting the lumber working around the end of the buggy from Cheek. Cheek would slide it off, and it would come down, and I would reach up, catch hold of the end of it, and rest it against the side of the buggy and turn it around and throw it in the buggy. I was trying to straighten a plank on the buggy, and Cheek sent down a plank before I got ready for it. When I first saw this piece of lumber coming down from above, it was in about 4 feet of me, and, if I had had my hands loose, I had plenty of time to have reached up and taken hold of it, but I didn't do this, because I had told Cheek to hold and wait a minute until I straightened that lumber. That plank got to me by falling."

The testimony offered by appellant shows that M. D. Cheek was merely an employé to load lumber as appellee was doing, and had no authority of hire or discharge and no authority over appellee or any other employé, and was not a foreman or subforeman or a straw boss. Appellee testified, however:

"I was employed by Mr. Pittman, and, when Mr. Pittman employed me, he said, 'Go to work with Mr. Cheek.' * * * And, in loading the lumber out from the run, Mr. Cheek received all the orders, and they were given by Mr. Pittman. * * * I obeyed the orders and instructions Mr. Cheek gave me from time to time. * * * Mr. Cheek directed me in doing the different kinds of work that I did. * * * I knew that he (Cheek) had no authority to fire or discharge me. He would make a report to Mr. Pittman whether a man would work or not. He had no authority over me at all, and I knew that he had none, only to go to Mr. Pittman if a man did not want to work after he would tell him what to do. He did not report me any. I could not tell you. I don't know how many times he ever reported anybody else."

Davis & Davis, of Center, Crook, Lord, Lawhon & Ney, of Beaumont, for appellant. Carter & Walker, of Center, for appellee.

LEVY, J. (after stating the facts as above). [1] The appellee predicates error, in the first assignment of error, upon the refusal of the court, after request so to do, to peremptorily instruct a verdict in its favor. The contention is upon the ground that the evidence conclusively shows that the appellee sustained his injury in the course of his work directly and only through the act of M. D. Cheek, working with and in the same common employment as himself, in carelessly turning loose and letting fall a plank that was being lowered by him from the stack of lumber for the purpose of being loaded by appellee on a truck. In his original petition appellee averred that his injury was caused by the negligent act of M. D. Cheek, as stated above. And the evidence of appellee, which is without dispute in the record, sustains such averment as to the manner of injury. Appellee testified that he and M. D. Cheek were at the time working together in taking lumber from a pile or stack and loading it on a truck. M. D. Cheek was on top of the stack lowering each plank to the appellee on the floor at the bottom of the stack, who would receive the plank from Cheek and load it properly on the truck. In the course of the loading a plank got crosswise on the truck, and appellee, raising his hand, said to Cheek, "Wait till I straighten this plank." At the time appellee requested Cheek to wait, it appears that Cheek "was coming over with this lumber," which inferably means that Cheek was in the act of lowering a plank at the time. It does not appear from the evidence whether Cheek did or did not either see appellee straightening the plank on the truck or hear the request of appellee to wait. It is inferable, though, that Cheek, with ordinary observation and prudence, could have seen that appellee was straightening the crosswise plank on the truck. M. D. Cheek, after lowering the plank the usual distance downward, simply turned it loose, and the end of the plank struck on the lumber on the truck and rapidly slid or glanced in the direction of appellee and hurt him. It was conclusively shown, and admitted as a fact by appellee, that M. D. Cheek was not clothed with authority of hire and discharge. The legal effect of these facts, established without dispute, is to make the relation between Cheek and appellee that of mere fellow servants and to deny appellee a recovery against appellant, upon the ground that his injury was solely caused by the negligent act of his fellow servant, for which appellant is not legally responsible. Langtry-Sharpe Contract-

ing Co. v. McCracken, 105 Tex. 407, 150 S. W. 1156. In Railway Co. v. Anderson, 102 Tex. 402, 118 S. W. 127, bearing some similarity as to the manner of injury, Anderson was injured by the falling of a rail which he and other section men were removing from the hand car to the track. And because Anderson and those assisting him, and causing the injury, were fellow servants under the common law, a recovery was denied Anderson. And to same effect under similar facts is Lakey v. Railway Co., 33 Tex. Civ. App. 44, 75 S. W. 566. Appellee urges a distinguishment between these cases and the instant one upon the ground that, taking appellee's testimony as to the capacity of M. D. Cheek, he was a subforeman with authority to direct the work and with instructions to report failures of duty to the general foreman. Under the rule firmly announced by the Supreme Court in the McCracken Case, supra, it is not thought that M. D. Cheek was, in the circumstances, in the relation of a vice principal of the appellant rather than a mere fellow servant working with appellee. M. D. Cheek was working at the time in the capacity and only doing the services of a fellow servant passing plank from the stack to the appellee. Performing at the time, as Cheek was, merely the duties of a servant, then, as to appellee engaged with him in the prosecution of the same common object, he was merely a fellow servant. And it would be this fact in this case, that Cheek was only discharging the duties customary in his work with appellee, and was not at the time of the injury exercising any power or function, if he had such, which was an essential attribute of the position of vice principal, that would control and determine that Cheek was not such representative of the appellant as would make it liable for Cheek's personal negligence.

[2] Appellee, though, insists that, if the evidence fails to support recovery on the ground alleged in the original petition, yet the peremptory instruction should have been refused because in the supplemental petition another ground of negligence was set up, and the evidence raises an issue in that respect. The appellant replies that allegations made in the supplemental petition could not afford the basis of recovery under the law of pleading. The ground of negligence set up in the supplemental petition is, in substance, that appellee and M. D. Cheek were doing the work of loading lumber as expeditiously as could be done with safety with all usual dispatch, and that W. C. Pittman, shed foreman and in general charge of the work as vice principal of appellant, came to the place of work and required of appellee and Cheek to do the work more rapidly than it could be done with safety, and, in an effort to obey the orders of W. C. Pittman, appellee was injured in the manner stated in his original petition. The full evidence relied on, as shown by the record, is as follows: Appellee testified:

"I was hurt directly after dinner. About 15 or 20 minutes before I was hurt I saw Mr. W. C. Pittman in the run where we were working. He came down there where we were unloading some lumber and changed our work and sent us up there to load out some lumber. He kinder got after Cheek a little bit about being slow loading some stuff. He asked him why he couldn't get this lumber out; that he didn't want those buggies standing there. I asked him if he were talking to me, and he said, 'No;' that he was talking to Cheek. We had been doing the work about as usual, as we always worked. The work was being done in a hurry. We were trying to get the lumber out. It was being done as rapidly as it could be done with safety. * * * He came down there and said they were needing lumber at the machines, and that they wanted some lumber, and said: 'Don't let those buggy hubs grow to the spindles. We want lumber up there. Keep those buggies loaded and get that stuff out of here.' And he jumped at a stack of lumber and pulled it off of another buggy down there that had been run in and stopped; and he wanted to get the buggies. He sent us from there to this stack of lumber. He told Mr. Cheek to go up there and load out some lumber, to load lumber on those buggies, and we did so. A hundred pieces, I believe, is the amount he wanted. * * * After Mr. Pittman had been down there and reprimanded Cheek he was getting the lumber out faster, he made the remark, 'Well, we will load it out in a hurry, and we will try and please him.'"

Assuming only for the moment that appellee could invoke the aid of his supplemental petition to enlarge the cause of action, still it is concluded, under the evidence, appellee would not be entitled to recover. The evidence conclusively establishes without dispute that the real producing cause of the injury was solely the act of M. D. Cheek in simply turning loose and letting fall a plank after being requested by appellee himself to wait a while. The order to hasten the work, previously given, did not include nor imply directions to Cheek to turn loose and let fall the plank whether or no. And the evidence does not, even remotely, explain or tend to show that the plank through hurry slipped or was caused to fall. Appellee explains it thus:

"Cheek would slide the lumber off, and it would come down, and I would catch the end of it. He would hold it until it came down, and I would catch hold of the end of it. * * * I was trying to straighten a plank on the buggy, and Cheek sent a plank down before I was ready for it. * * * When I first saw this piece of lumber coming down from above, it was in about 4 feet of me, and if I had had my hands loose I would have had plenty of time to have reached up and took hold of it, but I didn't do this because I had told Cheek to hold, to wait a minute until I straightened that lumber. I wasn't watching him, and didn't know the plank was loose until I heard it slide. It was sliding all the time it came over. * * * I knew when he turned it loose, because of the difference in the movement of it. * * * The first time I saw that it was turned loose was when it had struck the buggy and I looked around and saw it."

In view of the facts as admittedly shown by the record, it is believed the court should

have given the peremptory instruction. The judgment is therefore reversed and here rendered in favor of appellant, with all costs of appeal and of the trial court.

Reversed and rendered.